UNITED STATES of America,

v.

Gary Sherwood SMALL.

No. CR. 00–160.

United States District Court,
W.D. Pennsylvania.

Jan. 16, 2002.

Paul D. Boas, Berlin, Boas & Isaacson, Law & Finance Building, Pittsburgh, PA, for defendant.

Mary Beth Buchanan, United States Attorney's Office, Pittsburgh, PA, for U.S.

## MEMORANDUM ORDER

CINDRICH, District Judge.

Pending before the court is defendant's Motion To Dismiss Indictment (Doc. No. 14) and the government's Motion For A Preliminary Determination As To The Scope Of The Proceedings On The Defendant's Motion To Dismiss And For The Denial Of The Motion Without An Evidentiary Hearing (Doc. No. 38).

### I. *Background*

On August 30, 2000, a federal grand jury in the Western District of Pennsylvania returned a four-count indictment against defendant Gary Sherwood Small ("Small") charging him at Count One with Making a False Statement to a Federally Licensed Firearms Dealer in violation of 18 U.S.C. Section 922(a)(6)[1]; at Counts Two and Three with Possession of a Firearm by a convicted Felon in violation 18 U.S.C. Sec-

---

**1.** Section 922(a)(6) provides that:

It shall be unlawful—for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a ... licensed dealer ... knowingly to make any false or fictitious oral or written statement ... intended or likely to deceive such ... dealer ... with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter. 18 U.S.C. Section 922(a)(6).

tion 922(g)(1) [2]; and at Count Four with Possession of Ammunition by a Convicted Felon in violation of 18 U.S.C. Section 922(g)(1). The indictment indicates that Small had been previously convicted on April 12, 1994 in Naha, Japan District Court for certain violations of the Japanese Act Controlling the Possession of Firearms and Swords, the Gunpowder Control Act, and the Customs Act, all of which were offenses punishable by a term of imprisonment exceeding one year.[3] The government contends that Small violated Section 922(a)(6) in June 1998 when he purchased a firearm from a licensed firearms dealer and falsely represented to the dealer that he had never been convicted of an offense punishable by a term of imprisonment exceeding one year. The government further contends that Small violated Section 922(g)(1) in June 1998 and April 1999 when he knowingly possessed certain firearms and ammunition subsequent to his Japanese conviction.

## II. *Analysis*

Small filed the instant motion to dismiss arguing that the Japanese conviction should not be considered as a qualifying prior conviction under Section 922 because foreign convictions are not covered by the statute. More specifically, Small contends that Section 922's language "any court" refers to courts in the United States only. Small argues in the alternative that even if foreign convictions are deemed to be covered by Section 922, the Japanese conviction should not qualify as a predicate of-

fense because it failed to meet certain fundamental protections guaranteed by the United States Constitution. He maintains that an evidentiary hearing should be scheduled to give him an opportunity to present testimony and other evidence on the fairness of the Japanese conviction.

The government filed its motion for a preliminary determination as to the scope of the proceedings arguing that the indictment is valid regardless of the fairness of the underlying Japanese conviction because Section 922 focuses not on the reliability of a prior conviction, but on the fact of a prior conviction. The government argues in the alternative that the record of the Japanese criminal trial demonstrates the fairness of Small's criminal trial and obviates the need for an evidentiary hearing.

### A. *Foreign Convictions Under Section 922*

■ We address first Small's argument that no foreign conviction should qualify as a predicate offense under Section 922. Only three Courts of Appeals, not including our own, have addressed the issue of whether Section 922's language "any court" includes foreign convictions. The Courts of Appeals for both the Fourth and Sixth Circuits have held that under a plain reading of the term "any court," foreign convictions are covered by the statute. *See United States v. Atkins*, 872 F.2d 94 (4th Cir.1989) (English conviction was proper predicate conviction under Section 922); *United States v. Winson*, 793 F.2d

**2.** Section 922(g)(1) provides that:
It shall be unlawful for any person—*who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year* ... to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or

transported in interstate or foreign commerce.
18 U.S.C. Section 922(g)(1) (emphasis added).

**3.** The government maintains that Small was sentenced to a term of imprisonment of five years and was paroled on November 22, 1996. His parole term was terminated on May 26, 1998.

754 (6th Cir.1986) (Argentine and Swiss convictions were proper predicate convictions under Section 922).

In *Winson,* the Sixth Circuit Court of Appeals reversed a district court ruling that Section 922's language was ambiguous because the language in 18 U.S.C. Section 1202,[4] a statute similar to Section 922, expressly applied only to convictions by a court of the United States or of a State or any political subdivision thereof. 793 F.2d at 756. In light of the perceived ambiguity, the district court applied the rule of lenity[5] and found that the phrase "any court" did not include foreign courts.

The Court of Appeals reversed, explaining that "[i]n essence, the trial judge urges that we view the patently unambiguous language in section 922 as rendered latently so by the co-existence of the expressly different and more limiting language in section 1202." *Id.* at 757. The Court noted that the Supreme Court had "found a congressional intent to give each statute an independent construction and application, especially where, as here, the express language of the two [statutes] indicates different meanings." *Id.* The Court further noted that "[t]he power of Congress to legislate in this area is unquestioned. Therefore, 'resolution of the pros and cons of whether a statute should sweep broadly or narrowly is for Congress.'" *Id.* (citing *United States v. Rodgers,* 466 U.S. 475, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984)). Indeed, the use of more limiting language

in Section 1202 versus Section 922's broader language evinces Congress's attention to each statute's reach. The Court held, therefore, that the language "any court" in Section 922 was unambiguous and included foreign courts. *Id.*

The Court also found that Section 922 was neither inequitable on its face nor in its application to the case before it, if foreign convictions were treated as predicate offenses under the statute. *Id.* The Court explained:

> Since the object of the statute is to prevent the possession of firearms by individuals with serious criminal records, we can perceive no reason why the commission of serious crimes elsewhere in the world is likely to make the person so convicted less dangerous than he whose crimes were committed within the United States. Moreover, we do not perceive any congressional intent to exclude from the Act's coverage a class of felon whose unlawful conduct occurred outside this country.

*Id.* at 758. As to the particular foreign convictions at issue before it, the Court recognized that the defendant had not identified how such convictions were the result of violations of his civil rights or contrary to any cherished principal of American constitutional law. *Id.*

Agreeing with the logic employed in *Winson,* the Court of Appeals for the Fourth Circuit held in *Atkins* that an En-

---

4. Section 1202 provided in relevant part:
   Any person who—
   (1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony, ... and who receives, possesses, or transports in commerce or affecting commerce, after the date of enactment of this Act, any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both.
   *Winson,* 793 F.2d at 756 n. 3 (quoting 18 U.S.C. Section 1202). Section 1202 was en-

acted as part of the 1968 Omnibus Crimes Control and Safe Streets Act, and is no longer in effect.

5. The rule of lenity provides that an "'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" *Winson,* 793 F.2d at 756 (quoting *Rewis v. United States,* 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971)).

glish conviction qualified as a predicate offense under Section 922. *Atkins,* 872 F.2d at 96. The Court observed that "considering the plain meaning of the subject language, Atkin's conviction appears to satisfy the requirements of the statute. 'Any' is hardly an ambiguous term, being all-inclusive in nature." *Id.* The Court also noted that like the defendant in *Winson,* Atkin had not identified how his English conviction was contrary to any cherished principle of American constitutional law. *Id.* at 95 n. 1.

Contrary to the views of the Sixth and Fourth Circuits, the Court of Appeals for the Tenth Circuit recently held in *United States v. Concha,* 233 F.3d 1249 (10th Cir. 2000) that foreign convictions were not covered by Section 922. In that case the defendant, Concha, had been convicted of being a felon in possession of a firearm in violation of Section 922(g)(1). The government sought to enhance Concha's sentence under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. Section 924(e), which provides that a person who violates Section 922(g) shall have his sentence enhanced if he "has three previous convictions by any court referred to in section 922(g)(1) . . . ." 18 U.S.C. Section 924(e)(1). The government introduced four previous violent felony convictions, three of which took place in England.

Applying reasoning similar to that which was rejected by the Sixth Circuit Court of Appeals in *Winson,* the Tenth Circuit concluded that the patently unambiguous language in Section 922 was rendered latently ambiguous by the co-existence of the definition of the term "crime punishable by imprisonment for a term exceeding one year" appearing at 18 U.S.C. Section 921(20). Section 921 is the general statutory definitions section that applies to Section 922. Section 921(20) provides in pertinent part:

> The term "crime punishable by imprisonment for a term exceeding one year" does not include—
>
> (A) any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices, or
>
> (B) any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.

18 U.S.C. Section 921(20). The Court noted that the definition at Section 921(20) excludes certain federal and state crimes from Section 922(g)(1), but makes no comparable mention of foreign crimes. *Concha,* 233 F.3d at 1254. The Court observed, therefore, that "[i]f Section 922(g)(1) were meant to cover foreign crimes, we would be left with the anomalous situation that fewer domestic crimes would be covered than would be foreign crimes." *Id.* Based on this peculiar result and certain public policy reasons, the Court found that "contrary to the Fourth and Sixth Circuits, we believe that the statute is ambiguous." *Id.* at 1256. Faced with what it deemed an ambiguity, the Court applied the rule of lenity and held that foreign convictions could not be used as predicate offenses for sentencing enhancement under Section 924(e). *Id.*

In short, we agree with the findings of the Fourth and Sixth Circuit Courts of Appeals that the phrase "any court" in Section 922 is not ambiguous and includes foreign courts.[6] Accordingly, the rule of

---

6. In *Concha,* Judge Baldock dissented, noting his agreement with the Courts of Appeals for the Fourth and Sixth Circuits. *Concha,* 233

F.3d at 1256. Citing *Atkins* and *Winson,* Judge Baldock stated:

lenity is not applicable. *See Atkins*, 872 F.2d at 96 ("If statutory language is unambiguous, the principle of lenity is inapplicable." (citing *United States v. Turkette*, 452 U.S. 576, 587–88 n. 10, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981))). "Any" court means any court and there is nothing in the plain and unambiguous language of Section 922 indicating that Congress intended to exclude foreign convictions from such a broad term.

### B. *Qualifying Foreign Convictions*

■ Having found that foreign convictions can qualify as predicate offenses under Section 922, we next address the government's argument concerning which foreign convictions qualify. Citing *Custis v. United States*, 511 U.S. 485, 114 S.Ct. 1732, 128 L.Ed.2d 517 (1994), the government argues that all foreign convictions punishable by a term of imprisonment exceeding one year qualify regardless of the fairness of such convictions because Section 922 focuses not on the reliability of a prior conviction, but on the fact of a prior conviction.

In *Custis*, the defendant was convicted of violating Section 922(g)(1). Because he had three prior state felony convictions, the district court enhanced his sentence pursuant to Section 924(e)(1). The defendant appealed, arguing that the enhancement was not proper because two of the three prior convictions were constitutionally invalid. More specifically, the defendant maintained that he was denied effective assistance of counsel in connection with those convictions; that his guilty plea was not knowing and intelligent; and that he was not adequately advised of his rights

Absolutely nothing in the plain and unambiguous language of Section 924(e)(1) indicates that Congress intended to exclude from the statute's coverage a dangerous felon whose unlawful conduct occurred outside the United States.... Reasons why

to opt for a "stipulated facts" trial. 511 U.S. at 496, 114 S.Ct. 1732.

The Supreme Court observed that Section 924(e)(1) "focuses on the *fact* of the conviction and nothing suggests that the prior final conviction may be subject to collateral attack for potential constitutional errors before it may be counted." 511 U.S. at 490–91, 114 S.Ct. 1732 (emphasis in original). The Court concluded, therefore, that a defendant in a federal sentencing proceeding had no right to collaterally attack the validity of previous state convictions used to enhance his sentence under Section 924(e)(1). The Court recognized one exception, however, convictions where there was a failure to appoint counsel at all. The Court referred to its prior decision in *Johnson v. Zerbst*, 304 U.S. 458, 468, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), wherein the Court held:

Since the Sixth Amendment constitutionally entitles one charged with crime to the assistance of counsel, compliance with this constitutional mandate is an essential jurisdictional prerequisite to a federal court's authority to deprive an accused of his life or liberty. When this right is properly waived, the assistance of counsel is no longer a necessary element of the court's jurisdiction to proceed to conviction and sentence. If the accused, however, is not represented by counsel and has not competently and intelligently waived his constitutional right, the Sixth Amendment stands as a jurisdictional bar to a valid conviction and sentence depriving him of his life or his liberty.

Congress could have excluded such a felon from Section 924(e)(1)'s coverage (but did not) do not justify altering the statute's plain language by judicial fiat. *Id.*

The Court concluded, therefore, that there was "a historical basis in [its] jurisprudence of collateral attacks for treating the right to have counsel appointed as unique, perhaps because of [its] oft-stated view that '[t]he right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel.'" *Custis*, 511 U.S. at 494–95, 114 S.Ct. 1732 (quoting *Powell v. Alabama*, 287 U.S. 45, 68–69, 53 S.Ct. 55, 77 L.Ed. 158 (1932)).

The Court also found that the ease of administration and the interest in promoting the finality of judgments provided additional support for its holding. As to the ease of administration, the Court commented:

> [F]ailure to appoint counsel at all will generally appear from the judgment roll itself, or from an accompanying minute order. But determination of claims of ineffective assistance of counsel, and failure to assure that a guilty plea was voluntary, would require sentencing courts to rummage through frequently nonexistent or difficult to obtain state-court transcripts or records that may date from another era, and may come from any one of the 50 States.

*Id.*

As to finality, the Court stated that "'[i]nroads on the concept of finality tend to undermine confidence in the integrity of our procedures' and inevitably delay and impair the orderly administration of justice." *Id.* at 497, 114 S.Ct. 1732 (citation omitted). Moreover,

> [b]y challenging the previous conviction, the defendant is asking a district court 'to deprive [the] [state-court judgment] of [its] normal force and effect in a proceeding that ha[s] an independent purpose other than to overturn the prior judgemen[t].' These principles bear extra weight in cases in which the prior

convictions, such as the ones challenged by Custis, are based on guilty pleas. *Id.* (citation omitted). The Court ultimately held that the defendant could not attack the prior convictions because "[n]one of [the] alleged constitutional violations rises to the level of a jurisdictional defect resulting from the failure to appoint counsel at all." *Id.* at 496, 114 S.Ct. 1732.

We disagree with the government's interpretation of *Custis*. *Custis* does not qualify all foreign convictions, regardless of the fairness of such convictions, as Section 922 predicate offenses. First, at least one exception to the wholesale acceptance of foreign convictions must be implied from *Custis*—foreign convictions where there has been a failure to appoint counsel at all. Otherwise, a foreign conviction where there has been a failure to appoint counsel at all would qualify even though a corresponding conviction in the United States would not.

Also, there is an important distinction between the instant case and *Custis*. *Custis*, as opposed to the Japanese conviction at issue here, involved convictions governed by the United States Constitution which guarantees certain rights to ensure fundamental fairness in criminal prosecutions. *See Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). This concept of fundamental fairness forms the foundation of our judicial system and lies at the heart of our democracy. It is not surprising, therefore, that prior to *Custis* the vast majority of courts had understood the term "conviction" in the ACCA to mean "lawful conviction" and given defendants an opportunity to show that a prior conviction offered for enhancement was unconstitutionally obtained. *See Custis*, 511 U.S. at 498, 114 S.Ct. 1732 (Souter, J., dissenting). As Justice Souter explains in his dissent in *Custis*, the Court's prior decisions in *United States v.*

*Tucker,* 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972) and *Burgett v. Texas,* 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967) in particular "are easily (if not best) read as announcing the broader principle that a sentence may not be enhanced by a conviction the defendant can show was obtained in violation of any specific federal right ... because to do so would be to allow the underlying right to be denied anew and to suffer serious erosion." *Custis,* 511 U.S. at 505–06, 114 S.Ct. 1732 (Souter, J., dissenting) (citations omitted). Despite Congress's failure to ever express legislative disagreement with such precedent, the *Custis* majority essentially eliminated constitutional challenges to prior United States convictions at sentencing based on a tortured application of the rules of statutory interpretation and relevant case law. *See Custis,* 511 U.S. at 500–01, 114 S.Ct. 1732 (Souter, J., dissenting).

One could argue that the majority's ruling was reasonable, given that the convictions at issue in *Custis* were obtained in a United States state court where one can generally assume the concepts of fundamental fairness prevailed. The same cannot be said, however, in the context of a foreign conviction.[7] Given the uncertainty surrounding foreign convictions, a defendant should have an opportunity to challenge those convictions which were obtained in such a manner as to raise serious doubts about the credibility of the fact-finding process and, thus, to render it fundamentally unfair. Moreover, a defendant should not be limited in such challenges to a failure to appoint counsel claim.[8] Otherwise, as Small points out, a felony conviction by a Taliban "Court" in Afghanistan, where convictions can apparently begin and end with a mere accusation, would qualify.[9]

**7.** *See Bean v. United States,* 89 F.Supp.2d 828, 838 n. 8 (E.D.Tex.2000):

> [P]rocedural due process concerns are automatically raised with the use of foreign criminal convictions. The American concept of due process is one that has slowly developed and evolved over many years, ultimately providing a large body of procedural safeguards that work together to guarantee an acceptable level of fairness in criminal trials.

(quoting Martha Kimes, *The Effect of Foreign Criminal Convictions Under American Repeat Offender Statutes: A Case Against the Use of Foreign Crimes in Determining Habitual Criminal Status* ("Kimes"), 35 Colum J. Transnat'l L. 503, 518–21 (1997)).

**8.** The majority was careful to point out that its ruling only applied to constitutional challenges at sentencing and that the defendant could still pursue his challenge via federal habeas corpus review. *See Custis,* 511 U.S. at 497, 114 S.Ct. 1732. This observation highlights another important distinction between the two cases. In *Custis,* the prior convictions triggered a sentencing enhancement, whereas the Japanese conviction at issue here constitutes an element of the offense. Thus,

there was no doubt that the defendant in *Custis* was guilty of a serious offense and would be punished. The prior convictions were only relevant as to how much punishment. Here, however, the fact of guilt or innocence hinges upon the prior conviction. Thus, the opportunity to raise a constitutional challenge early on in the proceedings, as opposed to waiting for a protracted habeas corpus review, is of much greater importance here than in *Custis.*

**9.** The criminal conduct underlying a foreign conviction may also be an issue, given the differing views among foreign nations as to what constitutes illegal conduct. *See Bean,* 89 F.Supp.2d at 838 n. 8:

> In practice, the use of foreign convictions ... contravenes the principle that defendants should be treated equally. Because some countries display a much more punitive policy than others by criminalizing more behaviors and prosecuting violations of the law more aggressively, the use of foreign convictions ... invites arbitrary distinctions in punishment simply based on whether a defendant happens to have committed a prior crime in a country with strict, rather than lenient, policies. Despite

We note that permitting such challenges to foreign convictions would not unduly infringe upon the ease of administration or the interest in the finality of judgments. As to the ease of administration, we recognize the government's position that foreign court transcripts and records may sometimes be nonexistent or difficult to obtain. It is the defendant's burden, however, to establish that a prior foreign conviction was fundamentally unfair. *See Custis,* 511 U.S. at 511, 114 S.Ct. 1732 ("[N]o one disagrees that the burden of showing the invalidity of prior convictions would rest on the defendants." (Souter, J., dissenting)) Thus, the defendant, not the court, will be faced with this potentially difficult task. *Id.* ("It would not be sentencing courts that would have to [rummage through transcripts or record], however, but defendants seeking to avoid enhancement . . . ." (Souter, J., dissenting)). Moreover, 21 U.S.C. Section 851(c)(2) expressly permits defendants in drug cases to challenge prior

convictions used for sentencing enhancement purposes which were "obtained in violation of the Constitution of the United States . . . ." Federal courts have entertained such challenges for more than thirty years. *See Custis,* 511 U.S. at 511, 114 S.Ct. 1732 (Souter, J., dissenting). As to the interest in promoting the finality of judgments, such interest is significantly diminished in the context of foreign convictions.[10]

Having found that Small should be allowed to raise a constitutional challenge to his Japanese conviction, we next consider what standard should apply to that challenge. The instant case is apparently one of first impression, as neither we nor the parties have uncovered any cases where a court, after having found that Section 922 covers foreign convictions, has entertained a constitutional challenge to any such conviction. As previously noted, however, Section 851(c) permits defendants in drug

the same actual conduct, different defendants could be prosecuted for very different 'crimes' (or not prosecuted at all) depending solely on the punitive attitude of the country in which the conduct was committed. . . . It is within each country's power to determine what punishment to prescribe for crimes committed within its borders, but the fact that different countries do decide to prosecute very different crimes and impose very different punishments compounds the difficulty of using foreign convictions . . . .

(quoting Kimes, 35 Colum J. Transnat'l L. at 518–21). For example, should a felony conviction by a Taliban court in Afghanistan for possessing a bible or for a female not completely covering every inch of her body qualify? We think not. We need not answer this question here, however, as Small's Japanese conviction involved the smuggling of firearms and ammunition, conduct that most certainly constitutes a serious felony offense in the United States.

10. The government contends that if we were to find that all foreign felony convictions qualify as Section 922 predicate offenses re-

gardless of the fairness of such convictions, individuals such as Small would not be left without a remedy. More specifically, the government contends that Section 925(c) of Title 18 provides a mechanism for a felon to obtain prospective relief from Section 922. Section 925(c) provides that a felon may petition the Secretary of the Treasury for the restoration of firearm privileges, which the Secretary may grant if the applicant shows that he is not likely to act in a manner dangerous to public safety and the granting of relief would not be contrary to the public interest. The government maintains, therefore, that Small could have sought relief pursuant to Section 925(c) before he decided to possess the firearms at issue in the Japanese conviction. The government fails to mention, however, that "Congress has prevented any funds from being used for this mechanism in the appropriations bills every year since 1992." *Concha,* 233 F.3d at 1255 n. 3. Thus, several courts have held that the lack of congressional funding suspends any relief under Section 925(c). *Id.* Indeed, the government has vigorously argued the same in connection with a Section 925(c) petition that was recently before this judge.

cases to challenge prior convictions that were "obtained in violation of the Constitution of the United States . . . ." 21 U.S.C. Section 851(c)(2). The case law dealing with Section 851(c) challenges, therefore, provides helpful guidance for our review of the constitutional challenge at issue here.

The Court of Appeals for the Third Circuit most recently addressed a Section 851(c) challenge in *United States v. Kole*, 164 F.3d 164 (3d Cir.1998). In *Kole*, the government sought to enhance a defendant's drug sentence based on a previous drug conviction in the Philippines. The defendant argued that the Philippine conviction was obtained in violation of her rights under the United States Constitution because, among other things, she was denied effective assistance of counsel and a trial by jury. The court first considered the jury trial issue concluding at the outset that Section 851 was only intended to "ensure fundamental fairness by excluding any conviction that was obtained in a manner inconsistent with concepts of fundamental fairness and liberty endemic in the Due Process Clause of the Fifth Amendment of the United States Constitution." *Id.* at 171. Citing Supreme Court precedent dealing with the issue of which rights in the Bill of Rights are protected against state action by the Fourteenth Amendment, the Court of Appeals noted that:

> "[t]he Bill of Rights is evidence, at various points, of the content Americans find in the term 'liberty' and of American standards of fundamental fairness." Thus, " 'Due Process' expresses the requirement of 'fundamental fairness' " . . . "[A]pplying the Due Process Clause is therefore an uncertain enterprise which must discover what 'fundamental fairness' consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake."

*Id.* (quoting *Duncan*, 391 U.S. at 177, 88 S.Ct. 1444; *Lassiter v. Department of Soc. Serv. of Durham County, North Carolina*, 452 U.S. 18, 24, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)).

Of particular importance was the Court's review of *Duncan*, wherein the Supreme Court held that the concept of Due Process under the Fourteenth Amendment included the right to a jury trial for serious crimes. In *Duncan*, the Supreme Court noted that the test for determining whether a particular right is protected against state action by the Fourteenth Amendment has been phrased in a variety of ways. 391 U.S. at 149, 88 S.Ct. 1444. The Court recognized, for example, that "[t]he question has been asked whether a right is among those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions; whether it is basic in our system of jurisprudence; and whether it is a fundamental right, essential to a fair trial." The Court observed that the following rights had already been deemed to be protected under this test, which we refer to henceforth as the fundamental fairness test:

> the right to compensation for property taken by the State; the rights of speech, press, and religion covered by the First Amendment; the Fourth Amendment rights to be free from unreasonable searches and seizures and to have excluded from criminal trial any evidence illegally seized; the right guaranteed by the Fifth Amendment to be free of compelled self-incrimination; and the Sixth Amendment rights to counsel, to a speedy and public trial, to confrontation of opposing witnesses, and to compulsory process for obtaining witnesses.

*Id.* at 148, 88 S.Ct. 1444.

The Court of Appeals noted that although the Supreme Court had added the right to a jury trial to this list in *Duncan*

"as applied to the American legal system, it left no doubt that other societies may well be able to fashion a system with no juries that is fundamentally fair to the accused, thus comporting with our concept of due process." *Kole,* 164 F.3d at 172. The Court proceeded to review the rights of an accused under the Philippine legal system concluding that such system was consistent with the concept of fundamental fairness despite the absence of a right to trial by jury. *Id.* at 174. The Court then reviewed the Judge's opinion in the specific conviction at issue to determine whether the rights provided by the Philippine legal system were actually applied. The Court noted that the Philippine Judge's "opinion reflects the kind of careful, searching analysis of evidence that one would expect from a trial judge in the United States. The fact that [the defendant] was denied a jury trial ... in no way undermines her conviction there." *Id.* at 175.

The Court next considered the defendant's ineffective assistance of counsel claim. More specifically, the defendant argued that the use of the Philippine conviction violated her Sixth Amendment right to counsel because her trial attorney had an irreconcilable conflict of interest that prevented him from effectively representing her. *Id.* The Court noted that the defendant must "show some actual conflict of interest that adversely affected his counsel's performance in order to prevail." *Id.* After engaging in a detailed examination of the trial record, the Court concluded that the defendant had not satisfied her burden on the conflict issue.

In sum, the outcome of Small's constitutional challenge turns on the issue of whether the Japanese conviction comported with the concepts of fundamental fairness. As noted by the Court of Appeals in *Kole,* such determination is an uncertain enterprise which must be considered in the context of each case by first considering any relevant precedents and then by assessing any interests that are at stake. *164 F.3d at 171.*

### C. *Evidentiary Hearing*

■ The government argues that the availability of the trial record of the Japanese conviction obviates the need for an evidentiary hearing. We agree.

The government submitted a copy of the entire trial record of Small's Japanese criminal trial. *See* Record of the Japanese Trial ("Tr.Rec.") (Doc. No. 39). Small's counsel had ample opportunity to thoroughly review the record, and apparently did so based on the numerous detailed objections he makes to specific portions of it in his filings with the court. Although Small contends that he needs an evidentiary hearing to prove the unfairness of the conviction, he does not specify what he would present that is not already contained in the trial record or otherwise referred to in his briefs.[11] Thus, we fail to see what information Small could add to the case that is not already before the court. Accordingly, we agree with the government that an evidentiary hearing is not needed.

### D. *Fundamental Fairness of Japanese Conviction*

■ Small argues that the Japanese conviction did not comport with the concepts of fundamental fairness because:

---

**11.** Small does contend that he would present an expert witness at an evidentiary hearing on the Japanese criminal justice system. As we point out below, however, the deprivations of which Small claims are primarily directed at specific actions taken in his case, not the overall system of rights as stated in the Japa-nese constitution. More importantly, the relevant issue is what actually occurred in a particular case not what rights are purportedly provided. Thus, testimony by an expert on the Japanese legal system would not be particularly helpful in this case.

— he was denied the right to bail;

— he was interrogated for 25 consecutive days;

— he was denied the right to a speedy trial;

— one of the three judges who decided his case was substituted with a new judge during the trial;

— the trial transcript contains prejudicial hearsay;

— he was denied any appeal or appellate rights;

— the testimony by the prosecution's handwriting expert would not be admissible in an American court;

— he was denied the right to a jury trial;

— he was denied the right to remain silent;

— he was denied the right to confront his accusers; and

— he was denied the right to counsel or effective counsel at various crucial stages of the proceedings.

At the outset, we note that the Japanese Constitution contains many of the rights guaranteed by the United States Constitution. For example, the Japanese Constitution provides as follows:

Article 31: No person shall be deprived of life or liberty, nor shall any other criminal penalty be imposed, except according to procedure established by law.

　　*　　*　　*　　*　　*　　*

Article 33: No person shall be apprehended except upon warrant issued by a competent judicial officer which specifies the offense with which the person is charged, unless he is apprehended, the offense being committed.

Article 34: No person shall be arrested or detained without being at once informed of the charges against him or without the immediate privilege of counsel; nor shall he be detained without adequate cause; and upon demand of any person such cause must be immediately shown in open court in his presence and the presence of his counsel.

Article 35: The right of all persons to be secure in their homes, papers and effects against entries, searches and seizures shall not be impaired except upon warrant issued for adequate cause and particularly describing the place to be searched and things to be seized, or except as provided by Article 33. 2) Each search or seizure shall be made upon separate warrant issued by a competent judicial officer.

Article 36: The infliction of torture by any public officer and cruel punishments are absolutely forbidden.

Article 37: In all criminal cases the accused shall enjoy the right to a speedy and public trial by an impartial tribunal. 2) He shall be permitted full opportunity to examine all witnesses, and he shall have the right of compulsory process for obtaining witnesses on his behalf at public expense. 3) At all times the accused shall have the assistance of competent counsel who shall, if the accused is unable to secure the same by his own efforts, be assigned to his use by the State.

Article 38: No person shall be compelled to testify against himself. 2) Confession made under compulsion, torture or threat, or after prolonged arrest or detention shall not be admitted in evidence. 3) No person shall be convicted or punished in cases where the only proof against him is his own confession.

Article 39: No person shall be held criminally liable for an act which was lawful at the time it was committed, or of which he has been acquitted, nor shall he be placed in double jeopardy.

Government's Omnibus Response To Defendant's Pretrial Motions ("Gov's Resp.") (Doc. No. 28) Attach. 1, pp. 5–6. Thus, other than the absence of a right to a jury trial, the deprivations of which Small complains are directed at the specifics of his prosecution and not the overall system of rights as stated in the Japanese Constitution, which, not unsurprisingly in view of its origin, compare favorably with our own.

### 1. *Bail and Interrogation*

Small argues that the Japanese conviction was unfair because he was denied bail and was interrogated for 25 consecutive days. Although such actions may not be allowed by our system of justice, no custodial statements by Small, if any, were used against him at his trial. Thus, we fail to see how these events rendered his conviction unfair.[12]

### 2. *Speedy Trial and Judge Substitution, Hearsay, Appeal Rights*

Small contends that his conviction was unfair because he was denied the right to a speedy trial; that one of the three judges who decided his case was substituted with a new judge during the trial; and that he was denied any right to appeal the conviction. Small does not explain, however, and we fail to see, how these occurrences resulted in an unfair conviction.

Our system does demand a "speedy trial", but even when that promise is breached, the defendant is seldom entitled to relief in the form of a dismissal absent a showing of prejudice caused by the delay. Small has not explained how he was prejudiced by any delay in the trial in terms of making it less likely that reliable evidence adduced there pointed to his guilt as the tribunal found.

In the United States, it is not uncommon nor unacceptable to substitute one finder of fact for another when the first is unable to serve for the duration of the trial. Of course, under our practice, the alternate juror must have been present for all of the testimony during the trial. Apparently, in Japan, the law permits one of the judicial fact-finders to be substituted with another. Inasmuch as we have a transcript of the proceeding available to us, we presume it was likewise available to the substitute judge and thus, that he was in a position to make a finding as to guilt based on all of the evidence presented. In the absence of any evidence to the contrary, we also presume that the substitute judge heard a sufficient portion of the trial to enable him to make the necessary credibility findings as to prosecution witnesses. We also note that the prosecution's evidence consisted almost entirely of physical and documentary evidence and expert testimony, the type of evidence in which credibility determinations often play little, if any, part. This was not a case which turned on eyewitness identification testimony, for example, where a determination of the witness's credibility would be crucial and observation of the witness's live testimony would be necessary to effectively make such determination. In any event, this is not so radical a departure from our own accepted procedures as to render the trial "fundamentally unfair".

Nor do we find the absence of a right to appeal grounds for a finding that the trial itself was fundamentally unfair. In the United States we value liberty so highly that the convicted person is entitled to direct review (sometimes at multiple levels) and may collaterally attack the conviction (sometimes in both state and federal courts). However, our law as to the ap-

---

**12.** Denial of bail pending trial, especially in cases involving weapons, drugs and/or violent behavior, has become a common feature of our own system of justice.

propriate level of direct review as well as the opportunity for collateral attack have changed from time to time according to prevailing notions of what is just and proper, and in any event, are statutory, not Constitutional. We are not prepared to hold that another system, providing for less or even no appellate review, is fundamentally unfair on that ground alone.

### 3. *Hearsay*

Small argues that the trial transcript contains prejudicial hearsay. Despite having access to the trial transcript, Small only points to one instance of hearsay involving a reference to Small's alleged association with organized crime. Tr. Rec. Ex. 22 p. 11. Although it is not clear whether this testimony was inadmissible hearsay or subject to one of the many exceptions to the hearsay rule, a review of the trial transcript does not reveal the presence of inadmissible hearsay to such an extent that the trial was unfair. Moreover, Small's counsel had an opportunity to cross-examine witnesses on any hearsay testimony.

### 4. *Handwriting Expert*

Small argues that the Japanese conviction was unfair be because the testimony by the prosecution's handwriting expert would not have been admissible in an American court. We disagree.

Based on our review of the record, it appears that the handwriting expert's testimony was fairly introduced. First, the handwriting expert produced a written report which closely resembles a Fed. R.Civ.P. 26 report. The report contains, for example, a complete statement of all opinions to be expressed and the basis and reasons therefor and the data or other information considered by the expert in forming his opinion. Tr. Rec. Ex. 6. Also, the methods used by the expert is similar and/or identical to those of handwriting experts which typically testify before this court. Moreover, Small's counsel was given full opportunity to, and did, cross-examine the expert. Tr. Rec. Ex. 20.

### 5. *Jury Trial*

Small argues that his trial was unfair because he was not given a jury trial. We disagree.

As the Court of Appeals recognized in *Kole,* other countries may well be able to develop a system with no juries that is fundamentally fair to a defendant. 164 F.3d at 172. Indeed, the Court in *Kole* found that the Philippine justice system, which provided only a bench trial, was fair. The Court noted:

> [c]learly, the legal system of the Philippines seeks to guard the individual against official tyranny and protect individual liberty. Congress could not have intended ... to exclude criminal convictions obtained under such a system merely because that sovereign provides a method of protecting fundamental liberties that does not include the right to trial by jury.

*Id.* Just so here.

The Japanese system, like the Philippine system, seeks to guard the individual against official tyranny and protect individual liberty. Adherence to these ideals is evident by the thoroughness of the trial proceedings. The three judge panel in Small's case, for example, held several days of trial at which it received substantial testimonial and documentary evidence, all of which was subject to challenge and cross-examination by Small's counsel.

### 6. *Right to Remain Silent*

Small argues that his trial was unfair because he was denied the right to remain silent. More specifically, Small contends

that he was called to testify by the prosecution and that counsel for the prosecution commented to the judges on Small's attitude in failing to answer questions and continued denial of the charges. Although such conduct would be highly improper in a criminal prosecution in the United States, we cannot say that the prosecutor's actions cast any serious doubt on the accuracy of the fact-finding process or rendered Small's conviction unfair. The questioning of Small and reference to his silence makes up a small portion of the prosecution's case. As the government accurately recites in its brief, the trial record indicates that the prosecution presented substantial evidence of Small's guilt. Government's Motion For Preliminary Determination (Doc. No. 38) pp. 11–12. Moreover, defense counsel, in response to the prosecution's conduct, proffered an equally plausible explanation to the panel for Small's attitude in consistently denying the charges—his innocence. Tr. Rec. Ex. 24.

### 7. *Right to Confront Accusers*

Small contends that three witnesses testified by way of deposition and were not cross-examined by defense counsel. These three witnesses, all of whom were deposed in the United States, established that Small purchased the hot water heater in the United States and arranged for its shipment to Japan. Although such testimony would violate the confrontation clause of the United States Constitution, we agree with the government that the testimony of these witnesses was inconsequential. As the government points out, there was other evidence on the more significant point of whether Small shipped the hot water to Japan. For example, a handwriting expert concluded that it is "highly likely" that the same person wrote the name "Gary S. Small" and the address where Small was staying in Japan on the box that contained the water heater, the Customs Declaration Form, the shipment instructions, and an envelope that was addressed by Small and found on his person. Tr. Rec. Ex. 6. Small's name and address were also written on the box containing the hot water heater. Tr. Rec. Ex. 6. Finally, the handwriting expert testified that the same person wrote the declaration form, the shipping instructions, and the address on the box. Tr. Rec. Ex. 6. Also, Small attempted to claim the hot water heater in Japan and admitted that it was his. Tr. Rec. Ex. 18.

### 8. *Right to Counsel and Effective Counsel*

Small argues that he was denied effective assistance of counsel and was denied access to counsel during police interrogations.

As the Court of Appeals explained in *Kole*, a defendant must show that his counsel's representation fell below an objective standard of reasonableness. 164 F.3d at 175. If the defendant is able to make such a showing, he must then establish that he was prejudiced by counsel's dereliction. *Id.* Small baldly asserts that his counsel was ineffective, but does not indicate what he should have done differently. Indeed, as the government correctly notes, the trial record demonstrates that Small's attorney cross-examined witnesses and presented cogent arguments despite the overwhelming evidence introduced by the prosecution. As to the availability of counsel during police interrogations, we note again that no custodial statements by Small, if any, were used against him at trial. Accordingly, we find that Small's conviction was not rendered unfair by ineffective assistance of counsel or the absence of counsel during police interrogation.

In sum, we find based on our review of the trial record that Small's Japanese conviction was sufficiently consistent with our concepts of fundamental fairness and that we may have confidence in the reliability of the fact-finding process which led to it.

In accordance with the foregoing, **IT IS HEREBY ORDERED** that:

— The defendant's Motion To Dismiss Indictment (Doc. No. 14) is **DENIED**;

— The government's Motion For A Preliminary Determination As To The Scope Of The Proceedings On The Defendant's Motion To Dismiss And For The Denial Of The Motion Without An Evidentiary Hearing (Doc. No. 38) is **GRANTED** and the court rules that an evidentiary hearing is unnecessary under the circumstances present here.