# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1154

_____

United States of America,      *
     *
         Plaintiff - Appellant,      *
     *    Appeal from the United States
       v.      *    District Court for the
     *    District of North Dakota.
Roman Cavanaugh, Jr.,      *
     *
         Defendant - Appellee.      *

_____

Submitted: October 19, 2010
Filed: July 6, 2011

_____

Before RILEY, Chief Judge, MELLOY and BYE, Circuit Judges.

_____

MELLOY, Circuit Judge.

Roman Cavanaugh, Jr., was charged for the offense of domestic assault by a habitual offender, 18 U.S.C. § 117. As elements of the offense, the government must prove Cavanaugh received "a final conviction on at least 2 separate prior occasions in Federal, State, or Indian tribal court proceedings" for certain abuse offenses. Id. § 117(a). Below, the district court dismissed the indictment because, although Cavanaugh had received prior misdemeanor abuse convictions in tribal court on three separate occasions, Cavanaugh had not received the benefit of appointed counsel in the proceedings that resulted in the convictions.

The issues presented in this appeal are whether the Fifth or Sixth Amendments to the United States Constitution preclude the use of these prior tribal-court misdemeanor convictions as predicate convictions to establish the habitual-offender elements of § 117. Cavanaugh's prior convictions resulted in actual incarceration that, pursuant to Gideon v. Wainwright, 372 U.S. 335 (1963), and Scott v. Illinois, 440 U.S. 367 (1979), would have been unconstitutional in violation of the Sixth Amendment right to appointed counsel if the convictions had originated in a state or federal court. The district court, recognizing that the Sixth Amendment imposes no duty on Indian tribes to provide counsel for indigent defendants, noted that the prior convictions were valid at their inception and that the prior terms of incarceration were not in violation of the United States Constitution, tribal law, or the Indian Civil Rights Act, 25 U.S.C. § 1302. The court, nevertheless, held that the uncounseled convictions were infirm for the purpose of proving the habitual-offender, predicate-conviction elements of the § 117 offense in these subsequent federal court proceedings.

The government appeals, and we reverse. In doing so, we note an apparent inconsistency in several cases dealing with the use of arguably infirm prior judgments to establish guilt, trigger a sentencing enhancement, or determine a sentence for a subsequent offense. Ultimately, however, we are persuaded in this case that the predicate convictions, valid at their inception, and not alleged to be otherwise unreliable, may be used to prove the elements of § 117.

I.    Background

Cavanaugh is an enrolled member of the Spirit Lake Sioux Tribe and a repeat domestic-abuse offender. He was convicted in the Spirit Lake Tribal Court of misdemeanor domestic abuse offenses in March 2005, April 2005 (two counts), and January 2008. In all three cases, he was advised of his right to retain counsel at his own expense, but he did not do so. He alleges in the present case that he was indigent

at the time of his prior convictions.[1]  Importantly, Cavanaugh does not allege any irregularities in the proceedings that led to his prior tribal-court convictions beyond the absence of counsel.  The Spirit Lake Tribal Court provides an appeal procedure, but Cavanaugh did not appeal his tribal-court convictions.  Neither Cavanaugh nor the government state whether officials actually advised Cavanaugh of his right to appeal his tribal-court convictions.  Cavanaugh, however, does not assert deprivation of tribal appellate rights as an irregularity or infirmity surrounding his prior convictions.

The conduct giving rise to the present offense involved Cavanaugh's assault of his common-law wife who is also the mother of his child.  On the night of the offense, Cavanaugh and the victim were together in a car with children, Cavanaugh was driving, both adults were intoxicated, and Cavanaugh and the victim began fighting.  In the course of the fight, Cavanaugh grabbed the victim's head, jerked it back and forth, and slammed it into the dashboard.  He also threatened to kill her.  Cavanaugh then pulled the car into a field, where the victim jumped from the vehicle and hid.  Cavanaugh eventually drove away.  Authorities subsequently arrested Cavanaugh and charged him with the present offense.

In reaching its decision that Cavanaugh's prior tribal-court convictions could not be used to satisfy the elements of § 117, the district court reviewed relevant

---

[1]The record is devoid of evidence regarding Cavanaugh's indigency.  The district court assumed he was indigent at the time of his prior convictions, and we will do the same.  The government argued below and in its brief to our court that the question of Cavanaugh's indigency at the time of his prior offenses need only be addressed if it is determined that use of an uncounseled tribal-court conviction would be impermissible.  Given our resolution of the case, we need not address this question and may assume his indigency.  In addition, although the record before the district court failed to prove that Cavanaugh had been incarcerated for his prior convictions, Cavanaugh asserted that he had been incarcerated, the district court assumed Cavanaugh had been incarcerated, and on appeal, the government concedes this point.

federal caselaw regarding the permissible and impermissible uses of prior convictions. The court also addressed at some length the conditions of heightened violence and drug and alcohol abuse on Indian lands when compared to national averages. The court reviewed the legislative history of § 117, and noted concern with the high level of recidivism associated with domestic abusers as well as the often-increasing severity of such offenders' subsequent violent acts. The court concluded that Congress passed § 117, in part, as a gap-filling measure to capture repeat misdemeanor domestic-abuse offenders in a federal recidivist scheme that, generally, had applied only to persons convicted of felonies. The district court's review of the legislative history makes it clear that situations involving facts like those alleged in Cavanaugh's case are precisely the type of situations Congress intended to bring within the bounds of § 117.

The court also noted at some length the shortcomings of tribal justice systems caused by a lack of resources, the ongoing lack of resources to overcome these shortcomings, the evolving relationship between federal criminal jurisdiction and tribal jurisdiction, and the changes in the general policies of the United States towards tribal justice systems over the decades. The court ultimately concluded that, although uncounseled tribal misdemeanor convictions could result in actual incarceration in tribal facilities, such incarceration involved no violation of the United States Constitution because the Bill of Rights and the Fourteenth Amendment do not apply to Indian tribes and because the Indian Civil Rights Act does not impose upon tribes a duty to provide counsel for indigent misdemeanor defendants. The court held, nevertheless, that such convictions could not be used in federal courts to prove the elements of a criminal offense because the right to counsel applies in federal courts and because use of such convictions would, essentially, give rise anew to a Sixth Amendment violation by imposing federal punishment, in part, based upon the uncounseled conviction.

II.     Discussion

        A.      Validity of Cavanaugh's Prior Convictions

        Although the district court did not find Cavanaugh's tribal-court convictions invalid from their inception, Cavanaugh argues they were invalid from their inception because the tribal court did not provide court-appointed counsel.  This argument is without merit.  Although Indians are citizens of the United States entitled to the same constitutional protections against federal and state action as all citizens, the Constitution does not apply to restrict the actions of Indian tribes as separate, quasi-sovereign bodies.  See Santa Clara Pueblo v. Martinez, 436 U.S. 49, 56 (1978) ("As separate sovereigns pre-existing the Constitution, tribes have historically been regarded as unconstrained by those constitutional provisions framed specifically as limitations on federal or state authority."); Twin Cities Chippewa Tribal Council v. Minn. Chippewa Tribe, 370 F.2d 529, 533 (8th Cir. 1967) ("The guarantees of the Due Process clause relate solely to action by a state government and have no application to actions of Indian Tribes, acting as such.") (internal citations omitted).

        Congress, however, enjoys broad power to regulate tribal affairs and limit or expand tribal sovereignty through the Indian Commerce Clause, U.S. Const. art. I, § 8, cl. 3, and the Treaty Clause, art. II, § 2, cl. 2.  See United States v. Lara, 541 U.S. 193, 200 (2004).  Pursuant to this authority, Congress passed the Indian Civil Rights Act, selectively applying some, but not all, protections from the Bill of Rights to situations where an Indian tribe is the governmental actor.  See Pub. L. No. 90-284, Title II, § 202, 82 Stat. 77 (1968) (codified in part at 25 U.S.C. § 1302).  As currently amended by the Tribal Law and Order Act of 2010, Pub. L. No. 111-211, Title II, § 234(a), 124 Stat. 2279 (2010), the Indian Civil Rights Act only requires the appointment of counsel for indigent criminal defendants in tribal court for prosecutions that result in a term of incarceration greater than one year.  See 25 U.S.C.

§ 1302(a)(6), (b), & (c)(2).[2]  Accordingly, if a tribe elects not to provide for the right to appointed counsel through its own laws, Indian defendants in tribal court have no Constitutional or statutory right to appointed counsel unless sentenced to a term of incarceration greater than one year.

The tension inherent in the present case arises when such a conviction—valid at its inception as a matter of federal and tribal statutory law and as a matter of Constitutional law—is brought into federal or state court in an effort to establish or enhance a term of federal or state incarceration.  This tension exists because the tribal-court ability to impose a term of incarceration of up to one year based upon an uncounseled conviction is inconsistent with Gideon v. Wainwright, 372 U.S. 335 (1963), and Scott v. Illinois, 440 U.S. 367 (1979).  These cases, as explained more fully below, hold that federal and state courts cannot constitutionally impose *any* term of incarceration at the time of a conviction unless a defendant received, or validly waived the right to, counsel.

The government argues that, because Cavanaugh's prior convictions were valid from their inception, the convictions should be valid for use in federal court to prove the elements of the present § 117 violation.  Cavanaugh argues that, because the convictions would have been invalid if obtained in state or federal court, where the Sixth Amendment does apply, we should treat his prior convictions as infirm for use in federal court. These arguments raise two separate issues. First, whether Cavanaugh is correct that state or federal convictions, in and of themselves, would have been invalid for the purpose of proving a subsequent § 117 violation had they arisen in

---

[2]At the time of Cavanaugh's tribal convictions, which preceded the Tribal Law and Order Act of 2010, tribal courts were restricted to impose no sentences of incarceration greater than one year.  Now, tribal courts may impose longer sentences (up to three years for individual offenses). 25 U.S.C. § 1302(b). The Tribal Law and Order Act of 2010, however, now mandates court appointed counsel if a tribe imposes a sentence greater than one year.  Id. § 1302 (c)(2).

these circumstances or whether such state or federal convictions would be valid for such purposes (with only the prior terms of incarceration, rather than the convictions themselves, being unconstitutional). See Lewis v. United States, 445 U.S. 55, 66–67 (1980) ("We recognize, of course, that under the Sixth Amendment an uncounseled felony conviction cannot be used for certain purposes. . . . The Court, however, has never suggested that an uncounseled conviction is invalid for all purposes." (internal citations omitted)). Second, assuming such state or federal convictions would be infirm as §117 predicates, whether a similar, but otherwise valid tribal conviction should be treated as infirm for such purposes even though it technically was not unconstitutional.

As to the first question, we believe it is helpful to address the relevant Supreme Court and Eighth Circuit precedent involving the scope of the Sixth Amendment right to counsel and also those cases addressing limitations on the uses of arguably infirm prior judgments for recidivist or enhancement purposes. This review, however, does not provide a conclusive answer to the question of whether an uncounseled state or federal conviction could be used to prove the elements of a § 117 violation in this situation. This review does, in our view, provide guidance for answering the question of whether we should treat an otherwise valid tribal-court conviction as invalid for present purposes.

B.      Sixth Amendment Right to Counsel and Limitations on the Use of Uncounseled State or Federal Convictions.

The Supreme Court interpreted the Sixth Amendment as requiring court-appointed counsel for indigent federal defendants in Johnson v. Zerbst, 304 U.S. 458, 463 (1938). In Betts v. Brady, 316 U.S. 455, 471–72 (1942), the Court held that this Sixth Amendment right did not apply as against the states. The Court reconsidered the holding of Betts, however, in Gideon v. Wainwright, 372 U.S. 335, 345 (1963), and held that this Sixth Amendment right to counsel applies as against the states

-7-

through the Fourteenth Amendment. Gideon described the fundamental nature of this right by explaining how the absence of counsel called into question the reliability of any resulting conviction:

> "Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence."

Gideon, 372 U.S. at 345 (quoting Powell v. Alabama, 287 U.S. 45, 69 (1932)).

Subsequently, in a line of cases that culminated with Argersinger v. Hamlin, 407 U.S. 25 (1972), the Court explained the limitations of this right. The circuits, however, found Argersinger to be unclear, and in Scott v. Illinois, 440 U.S. 367 (1979), the Court revisited the issue, clarifying Argersinger and unambiguously holding that the right to counsel is violated when a defendant is sentenced to any term of incarceration: it is the actual deprivation of liberty, not the jeopardy of a deprivation of liberty, not some lesser form of punishment, and not any particular length of incarceration that triggers the protections of the Sixth Amendment. Scott, 440 U.S. at 373–74 (affirming an uncounseled conviction not resulting in imprisonment and stating, "We therefore hold that the Sixth and Fourteenth Amendments to the United States Constitution require only that no indigent criminal defendant be sentenced to a term of imprisonment unless the State has afforded him the right to assistance of appointed counsel in his defense"); see also Glover v. United States, 531 U.S. 198, 203 (2001) ("[A]ny amount of actual jail time has Sixth Amendment significance.").

Our court, and other courts, have put <u>Scott</u> into practice by vacating sentences, but leaving convictions intact, where the government obtained convictions and sentences of incarceration without providing counsel. <u>See, e.g.</u>, <u>United States v. White</u>, 529 F.2d 1390, 1394 (8th Cir. 1976) ("Although the conviction is valid, we cannot affirm his 90-day suspended prison term since appellant did not clearly waive his right to counsel. . . . Therefore, we vacate the 90-day suspended sentence but affirm the conviction and $50 fine."); <u>see also</u> <u>United States v. Ortega</u>, 94 F.3d 764, 770 (2d Cir. 1996) ("At the outset, we reject defendants-appellants' contention that their state court convictions are invalid. Under <u>Scott</u>, the Sixth Amendment protects an uncounseled misdemeanor defendant not from a judgment of conviction but from the imposition of certain types of sentences. The appropriate remedy for a <u>Scott</u> violation, therefore, is vacatur of the invalid portion of the sentence, and not reversal of the conviction itself."). This treatment of <u>Scott</u>, however, fails to answer the question of whether or how a subsequent court might be able to make use of such a conviction for enhancement purposes or to prove the elements of a recidivist offense.

After <u>Gideon</u>, and before <u>Scott</u>, the Supreme Court initially determined that several different uses of infirm prior convictions were impermissible during subsequent proceedings if the earlier convictions were obtained in violation of the right to counsel. In <u>Burgett v. Texas</u>, 389 U.S. 109, 115 (1967), for example, the Court held that an uncounseled prior felony conviction could not be used to enhance a defendant's punishment pursuant to a recidivist statute. In <u>United States v. Tucker</u>, 404 U.S. 443, 444 (1972), the Court held a sentencing judge could not consider a prior uncounseled felony conviction in setting a federal sentence pursuant to the then-prevailing, federal sentencing regime. Also, in <u>Loper v. Beto</u>, 405 U.S. 473, 484 (1972), the Court held prosecutors could not impeach a defendant with a prior, uncounseled felony conviction. These cases seem to have reflected a general belief that it was necessary to prevent erosion of the "principle" of <u>Gideon</u> and that the earlier deprivation of counsel, essentially, flowed through to the subsequent proceeding to make any future punishment or enhancement of punishment obtained

in reliance on the earlier conviction a new violation of <u>Gideon</u>.  For example, the Court in <u>Burgett</u> stated:

> To permit a conviction obtained in violation of <u>Gideon v. Wainwright</u> to be used against a person *either to support guilt or enhance punishment* for another offense is to erode the principle of that case. Worse yet, since the defect in the prior conviction was denial of the right to counsel, the accused in effect suffers anew from the deprivation of that Sixth Amendment right.

<u>Burgett</u>, 389 U.S. at 115 (internal citation omitted) (emphasis added).

The penultimate case in this line of cases arguably was <u>Baldasar v. Illinois</u>, 446 U.S. 222, 227–28 (1980), in which the Court held, post-<u>Scott</u>, that an uncounseled misdemeanor conviction that resulted in no term of incarceration (and therefore, as per <u>Scott</u>, involved no deprivation of constitutional rights) nevertheless could *not* be used to enhance a subsequent Illinois misdemeanor into a felony under the state's enhancement statute.  <u>Baldasar</u>, however, was a fractured opinion within which the plurality opinion merely referenced the rationale of the concurrence, but in which there were separate concurrences without wholly consistent explanations for their results.  One of the concurrences based its conclusion in part on reliability concerns, noting, "We should not lose sight of the underlying rationale of <u>Argersinger</u>, that unless an accused has the guiding hand of counsel at every step in the proceedings against him, his conviction is not sufficiently reliable to support the severe sanction of imprisonment."  <u>Baldasar</u>, 446 U.S. at 227 (Marshall, J., concurring) (internal citation omitted).

If <u>Baldasar</u> had been the last word on this subject, Cavanaugh's position would, indeed, be strong in this appeal.  <u>Baldasar</u> actually precluded the use of a prior uncounseled conviction even though the prior conviction did not involve a constitutional violation; Cavanaugh, similarly, seeks to preclude the use of his prior

-10-

uncounseled conviction even though his prior conviction did not involve a constitutional violation. Further, to the extent Baldasar rested on reliability concerns, the absence of counsel arguably would result in the same type of reliability concern regardless of whether the denial of counsel occurred in state, federal, or tribal court or actually resulted in a constitutional violation.

Baldasar was not the last word, however, because in 1994, the Court held that an uncounseled conviction *could* be used for enhancement purposes, expressly overruling Baldasar. See Nichols v. United States, 511 U.S. 738, 748–49 (1994) (according criminal history points pursuant to the then-mandatory United States Sentencing Guidelines for an earlier uncounseled misdemeanor DUI conviction to determine a Guideline range for a subsequent federal drug offense, shifting the mandatory Guidelines range upward by approximately two years, and stating, "Today we adhere to Scott v. Illinois . . . and overrule Baldasar"). In Nichols, the uncounseled prior conviction, like the prior conviction in Baldasar had not resulted in a constitutional violation because it had not resulted in a term of incarceration. An important rationale from Nichols, that seemingly cannot be reconciled with the language quoted above from Burgett, was that the subsequent use of the conviction for enhancement purposes did not change the penalty for the prior conviction; rather, the subsequent sentence punished only the subsequent offense.[3] See Nichols, 511 U.S.

---

[3]Compare Nichols, 511 U.S. at 757–58 (Blackmun, J., dissenting):

The Court skirts Scott's actual imprisonment standard by asserting that enhancement statutes "do not change the penalty imposed for the earlier conviction," . . . because they punish only the later offense. Although it is undeniable that recidivist statutes do not impose a second punishment for the first offense in violation of the Double Jeopardy Clause . . . , it also is undeniable that Nichols' DUI conviction directly resulted in more than two years' imprisonment. In any event, our concern here is not with multiple punishments, but with reliability. Specifically, is a prior uncounseled misdemeanor conviction sufficiently reliable to justify

-11-

at 746–47 ("Enhancement statutes, whether in the nature of criminal history provisions such as those contained in the Sentencing Guidelines, or recidivist statutes that are commonplace in state criminal laws, do not change the penalty imposed for the earlier conviction. As pointed out in the dissenting opinion in Baldasar, '[t]his Court consistently has sustained repeat-offender laws as penalizing only the last offense committed by the defendant.'" (quoting Baldasar, 446 U.S. at 232)).

Further, not only did Nichols reject the theory that some portion of a subsequent punishment could be viewed as having been "caused" by a prior conviction, the majority in Nichols appears to have rejected arguments that formed one of the foundations for Gideon—arguments based on concerns about prior convictions' reliability. We reach this conclusion because the Nichols majority made no express reference to reliability concerns and only arguably addressed the issue by distinguishing the sentencing context from guilt determinations. Meanwhile, a separate concurrence by Justice Souter discussing such concerns garnered no support

---

additional jail time imposed under an enhancement statute? Because imprisonment is a punishment "different in kind" from fines or the threat of imprisonment, . . . we consistently have read the Sixth Amendment to require that courts decrease the risk of unreliability, through the provision of counsel, where a conviction results in imprisonment. That the sentence in Scott was imposed in the first instance and the sentence here was the result of an enhancement statute is a distinction without a constitutional difference.

Id. (internal citations omitted).

from any of the other Justices,[4] and the dissent in <u>Nichols</u> rested primarily upon reliability concerns.[5]

The Court subsequently made reference again to reliability concerns, this time in <u>Alabama v. Shelton</u>, 535 U.S. 654, 667 (2002). In <u>Shelton</u>, the court held that an uncounseled conviction resulting in a suspended term of incarceration violated the Sixth Amendment. There, the Court distinguished <u>Nichols</u> as a case arising in the sentencing context. <u>Id.</u> at 665. The Court rejected a broad argument that sequential proceedings must always be analyzed separately for Sixth Amendment purposes such that only immediate incarceration raises Sixth Amendment concerns. <u>Id.</u> at 666.

---

[4]<u>Id.</u> at 752–53 (Souter, J., concurring in the judgment) (downplaying reliability concerns because, even pursuant to the then-mandatory Sentencing Guidelines, sentencing courts possessed some discretion in the form of downward departures, stating, "Under the Guidelines, then, the role prior convictions play in sentencing is presumptive, not conclusive, and a defendant has the chance to convince the sentencing court of the unreliability of any prior valid but uncounseled convictions in reflecting the seriousness of his past criminal conduct or predicting the likelihood of recidivism.").

[5]In the dissent, Justice Blackmun, joined by Justices Stevens and Ginsburg, argued that any distinction between allowing direct incarceration at the time of an uncounseled conviction and allowing future incarceration based upon the prior uncounseled conviction was a distinction without meaning and that only a complete ban on incarceration "caused" by uncounseled convictions could logically preserve the rule of <u>Gideon</u>. The dissent stated:

> Given the utility of counsel in [misdemeanor] cases, the inherent risk of unreliability in the absence of counsel, and the severe sanction of incarceration that can result directly *or indirectly* from an uncounseled misdemeanor, there is no reason in law or policy to construe the Sixth Amendment to exclude the guarantee of counsel where the conviction subsequently results in an increased term of incarceration.

<u>Id.</u> at 763 (emphasis added).

Rather, the Court stated that the Sixth Amendment applies at the time a defendant is adjudicated guilty of an offense, whether actual incarceration is imposed contemporaneously with the finding of guilt, or later following some subsequent triggering event. Id. at 663–64. The court also rejected the argument that the provision of counsel at a subsequent hearing surrounding the revocation of the suspended sentence and imposition of a term of incarceration could make up for the absence of counsel at the guilt phase. The Court stated:

> We think it plain that a hearing so timed and structured cannot compensate for the absence of trial counsel, for it does not even address *the key Sixth Amendment inquiry: whether the adjudication of guilt corresponding to the prison sentence is sufficiently reliable to permit incarceration.* Deprived of counsel when tried, convicted, and sentenced, and unable to challenge the original judgment at a subsequent probation revocation hearing, a defendant in Shelton's circumstances faces incarceration on a conviction that has never been subjected to "the crucible of meaningful adversarial testing[.]" The Sixth Amendment does not countenance this result.

Id. at 667 (internal citations omitted) (emphasis added). Although Shelton emphasized reliability concerns, it also emphasized the presence of an actual Sixth Amendment violation, and the incarceration at issue was incarceration for the underlying offense.

Subsequently, in 2004, our court rejected an argument by the government that Nichols would permit the use of a prior uncounseled conviction for the purpose of assigning criminal history points under the then-mandatory Guidelines regime where the prior conviction had resulted in actual incarceration in violation of Scott. See United States v. Charles, 389 F.3d 797, 799 (8th Cir. 2004) ("The government, however, misreads Nichols. The Court's holding was limited to the use of an uncounseled misdemeanor conviction, valid under Scott because *no prison term was imposed.* Charles disputes the use of convictions as to which a jail term was imposed,

-14-

and as to which he thus had a constitutional right to counsel under <u>Scott</u>.") (internal citation omitted). By emphasizing this distinction, we believe our circuit recognized that, regardless of whether reliability-based concerns exist, it is the fact of a constitutional violation that triggers a limitation on using a prior conviction in subsequent proceedings.

<u>Nichols</u> and <u>Shelton</u>, however, do not necessarily answer all questions regarding permissible uses of prior convictions. <u>Shelton</u> was a direct appeal involving the imposition of the original suspended sentence. The references to future imprisonment in <u>Shelton</u> were references to activation of the original sentence, not references to use of the conviction to determine guilt or assess punishment for some different crime. <u>Nichols</u> was a sentencing case pursuant to the then-mandatory Guidelines, which permitted at least a modicum of discretion and, therefore, differed from the present case and the government's present attempt to prove the actual elements of a subsequent federal offense. In this regard, we emphasize that <u>Nichols</u> relied, to a large extent, on the fact that the subsequent use of the prior conviction was merely to determine a sentence pursuant to the Guidelines rather than to establish guilt. <u>Nichols</u>, 511 U.S. at 747 ("Reliance on such a conviction is also consistent with the traditional understanding of the sentencing process, which we have often recognized as less exacting than the process of establishing guilt."). The Supreme Court specifically noted that, traditionally, in the sentencing process, judges considered not only convictions but "a defendant's past criminal behavior, even if no conviction resulted from that behavior," and that the Court previously had upheld consideration of such facts. <u>Id.</u> (citing <u>Williams v. New York</u>, 337 U.S. 241 (1949)).

Post-<u>Nichols</u>, then, it is arguable that the fact of an actual constitutional violation is, perhaps, not only an important factor for determining when a prior conviction may be used for sentence enhancement purposes, but a required or controlling factor. It also seems clear that, where the subsequent use is to prove the

actual elements of a criminal offense, <u>Nichols</u> is of questionable applicability, given that Court's emphasis on the differences between sentencing and guilt determinations.

Added to this developing, but incomplete body of authority, there exists another line of cases that address the use of prior convictions or prior civil adjudications to establish the actual elements of subsequent offenses. These cases, however, reach results that are difficult, if not impossible, to reconcile with one another, much less with the cases just discussed. Among these cases, the government relies in particular on <u>Lewis v. United States</u>, 445 U.S. 55, 67 (1980), a case that predated <u>Nichols</u> and permitted the use of a prior uncounseled conviction to prove an element of an offense even though the prior conviction had resulted in incarceration in violation of <u>Scott</u>. <u>Lewis</u> held specifically that a prior uncounseled felony conviction could be used to support a subsequent, federal conviction for possession of a firearm by a felon (pursuant to a felon-in-possession statute that was a predecessor to 18 U.S.C. § 922). <u>Id.</u> The Court held such a use permissible because the later federal criminal prosecution served merely as the enforcement mechanism for a "civil" firearms restriction. <u>Id.</u> (stating that the prior conviction was being used only to enforce an "essentially civil disability through a criminal sanction" and "not [to] 'support guilt or enhance punishment'" (quoting <u>Burgett</u>, 389 U.S. at 115)). Discussing the "reliability" rational (that carried weight prior to <u>Nichols</u>, in cases such as <u>Burgett</u>, <u>Tucker</u>, and <u>Beto</u>), the court in <u>Lewis</u> stated, "The federal gun laws, however, focus not on reliability but on the mere fact of conviction, or even indictment, in order to keep firearms away from potentially dangerous persons." <u>Id.</u> at 67.[6]

---

[6]A dissent in <u>Lewis</u> characterized the majority's distinction in this regard as unconvincing:

> The Court's attempt to distinguish <u>Burgett</u>, <u>Tucker</u>, and <u>Loper</u> on the ground that the validity of the subsequent convictions or sentences in those cases depended on the *reliability* of the prior uncounseled felony convictions, while in the present case the law focuses on the mere *fact* of the prior conviction, is unconvincing. The fundamental rationale

-16-

Reaching an outcome difficult to reconcile with Lewis, the Court in United States v. Mendoza-Lopez, 481 U.S. 828 (1987), later held that, in a prosecution for illegal re-entry following a deportation, where the "prior deportation is an *element of the crime,*" id. at 833 (emphasis added), a defendant may, during the later criminal proceedings, attack the prior civil adjudication that led to the deportation. Id. at 841–42. The alleged constitutional infirmity with the prior civil adjudication in Mendoza-Lopez was a due-process violation based on a denial of any meaningful procedure for appellate review of the deportation ruling. The Court stated, "[a] statute [that] envisions . . . a court may impose a criminal penalty for reentry after *any* deportation, regardless of how violative of the rights of the alien the deportation proceeding may have been, . . . does not comport with the constitutional requirement of due process." Id. at 837. Mendoza-Lopez distinguished Lewis based on language from Lewis recognizing that "a convicted felon may challenge the validity of a prior conviction, or otherwise remove his disability, before obtaining a firearm," Lewis, 445 U.S. at 67. Read broadly, however, Mendoza-Lopez stands for the proposition that certain constitutional infirmities in underlying proceedings make use of the judgment from such a proceeding infirm for the purpose of proving an element of a subsequent criminal charge. Broadly read, Lewis stands for the proposition that "status" is all that matters and questions surrounding the reliability of the conviction imposing that status

> behind those decisions was the concern that according any credibility to an uncounseled felony conviction would seriously erode the protections of the Sixth Amendment. Congress' decision to include convicted felons within the class of persons prohibited from possessing firearms can rationally be supported only if the historical fact of conviction is indeed a reliable indicator of potential dangerousness. As we have so often said, denial of the right to counsel impeaches "the very integrity of the fact-finding process." And the absence of counsel impairs the reliability of a felony conviction just as much when used to prove potential dangerousness as when used as direct proof of guilt.

Lewis, 445 U.S. at 72 (Brennan, J., dissenting, joined by Justices Marshall and Powell) (internal citations omitted).

cannot justify barring the use of that conviction to prove the elements of a subsequent offense.

Taken together, these cases—up to and including <u>Nichols</u> and <u>Mendoza-Lopez</u>—fail to provide clear direction as to whether an uncounseled misdemeanor conviction obtained in violation of <u>Scott</u> could be used to prove the elements of a § 117 offense. <u>Nichols</u> falls short in answering the question because it did not involve a guilt-phase determination and because there was no actual <u>Scott</u> violation at issue in <u>Nichols</u>. Further, as the opinion in <u>Shelton</u> demonstrates, there may be limits to the theory that subsequent impositions of terms of incarceration punish only the subsequent acts (rather than alter punishment for the earlier offense). Finally, <u>Lewis</u> and <u>Mendoza-Lopez</u> fall short because it is not clear if § 117 is more akin to the firearms restriction involved in <u>Lewis</u> (for which "status" and the fact of conviction were all that mattered and infirmities in the underlying conviction were held to be immaterial) or the illegal reentry following deportation involved in <u>Mendoza-Lopez</u> (for which infirmities in the underlying civil judgment precluded proof of the subsequent offense, but in which the violation at issue was not analogous to the present case).

C.    Use of Cavanaugh's Tribal Conviction

The ultimate question in the present case, however, is not whether a prior conviction involving a <u>Scott</u> violation may be used to prove a § 117 violation. It is whether an uncounseled conviction resulting in a tribal incarceration that involved no actual constitutional violation[7] may be used later in federal court. In this regard, we

_____

[7]It perhaps would be more appropriate to refer to the proceedings that led to Cavanaugh's prior convictions as lying "outside the bounds of the United States Constitution" rather than as "not involving a violation of the United States Constitution." In this regard, we note that Cavanaugh states in his brief that using the present convictions would be akin to accepting prior convictions from Iran. Although

-18-

note that none of the previously discussed cases precluded the use of a prior conviction for any purpose in the absence of an actual violation of the United States Constitution.[8] As per Nichols, then, we believe it is necessary to accord substantial weight to the fact that Cavanaugh's prior convictions involved no actual constitutional violation. Even assuming the cases discussed above collectively would preclude use of a prior state or federal conviction in the present circumstances, we do not believe we are free to preclude use of the prior conviction merely because it *would have been* invalid had it arisen from a state or federal court.

Our approach is, admittedly, categorical in nature rather than firmly rooted in the reliability concerns expressed in Gideon. Further, it fails to accord any special weight to the unique reason for why there was no constitutional violation in Cavanaugh's prior proceedings—the "gap" in the right to counsel caused by incomplete extension of Sixth Amendment coverage to Indian tribes through the Indian Civil Rights Act. Still, we believe the Court's emphasis in Nichols on the existence or absence of a prior constitutional violation was clear, and, as we recognized in Charles, we believe the Court held the technical validity of a conviction

---

presented with rhetorical flare, his point is not lost on this panel. As a practical matter, however, even without reaching any constitutional questions, it is clear the language of the present statute would not allow the use of such convictions, it references only federal, state, and tribal convictions. See Small v. United States, 544 U.S. 385, 387 (2005) (refusing to read into a statute an intent to use convictions from foreign jurisdictions). Further, this is a not a case involving allegations of other gross irregularities or abuses as Cavanaugh undoubtedly intended to suggest would be present in the courts of the cited foreign state. Here, Cavanaugh's counsel stated clearly at oral argument that Cavanaugh alleges no irregularities with his tribal-court proceedings other than the denial of counsel (which was not a violation of any tribal or federal law).

[8]Baldasar serves as the exception to this statement, but, as already noted, the Court expressly overruled Baldasar in Nichols.

-19-

was a more important factor than the <u>Gideon</u>-type reliability concerns that always arise when counsel is absent.

Also, although we do not believe <u>Lewis</u> or <u>Mendoza-Lopez</u> directly control in the present context, we do not read either case as precluding the use of Cavanaugh's prior convictions. To the extent the present situation is akin to <u>Lewis</u>, in which the Court emphasized that the defendant could have moved to vacate his convictions prior to committing the latter offense, we note that Cavanaugh does not allege he attempted to vacate his prior convictions at any time prior to these proceedings. In fact, he does not even allege he pursued an appeal, and he alleges neither that he was innocent of the tribal charges nor that there were any other irregularities in the tribal proceedings. Further, to the extent Cavanaugh's case is akin to <u>Mendoza-Lopez</u>, where the court held a deprivation of appellate rights could preclude subsequent use of a civil adjudication to establish guilt, Cavanaugh does not allege any irregularities related to a deprivation of appellate rights, and, in any event, we do not view <u>Mendoza-Lopez</u> as fully reconcilable with <u>Lewis</u>.

Other courts have disagreed as to whether prior tribal court proceedings should be *treated* as involving constitutional violations where a similar absence of counsel would have violated the Sixth Amendment had it occurred in federal or state court. <u>Compare</u> <u>State v. Spotted Eagle</u>, 71 P.3d 1239, 1245–46 (Mont. 2003) (refusing to treat a tribal proceeding as though it involved a Sixth Amendment violation) <u>with</u> <u>United States v. Ant</u>, 882 F.2d 1389, 1394 (9th Cir. 1989) (treating a tribal proceeding as though it had involved a Sixth Amendment violation). In <u>Ant</u>, the Ninth Circuit held that it was impermissible to use a prior, uncounseled, tribal-court guilty plea to prove the underlying facts for a subsequent federal manslaughter charge. <u>Ant</u>, 882 F.2d at 1395. <u>Ant</u> differed from the present case in that the federal proceedings in <u>Ant</u> arose out of the same alleged incident as the tribal proceedings at issue in the case. Also, the government in <u>Ant</u> sought to use the guilty plea from tribal proceedings to prove, not the fact of a prior conviction, but rather the truth of the matters asserted in

the plea. The court in Ant ultimately held it was necessary to suppress the guilty plea from tribal court because, although the guilty plea was not obtained in violation of tribal law or the Indian Civil Rights Act, "the tribal court guilty plea was made under circumstances which would have violated the United States Constitution were it applicable to tribal proceedings . . . ." Id. at 1390. The court also noted that its holding would not "unduly prejudice" the government because the government could still prove the facts by other means. Id.

In the Montana case, the state sought to use the *fact* of a prior tribal-court conviction to enhance a state DUI charge to felony status. Spotted Eagle, 71 P.3d at 1241. The Montana Supreme Court expressed the need to avoid "interfering with the tribal courts and the respective tribe's sovereignty," stressed that the tribal-court conviction was valid from its inception, and noted that, "Nothing of record indicates that the proceedings were fundamentally unfair or that Spotted Eagle was in fact innocent of the tribal charges." Id. at 1245. The court refused to treat the tribal convictions as invalid merely because, "had [they] been obtained in a federal or state court, they would [have been] invalid at their inception pursuant to Scott." Id. at 1243. This determination seemingly is consistent with our conclusion and Nichols.

In discussing interference with tribal sovereignty, however, the court in Spotted Eagle made two points, only one of which we find convincing. The court noted that general principles of comity required the Supreme Court of Montana to "give full effect to the valid judgments of a foreign jurisdiction according to that sovereign's laws, not the Sixth Amendment standard that applies to proceedings in Montana." Id. at 1245. The court, however, also discussed the risk of "imposing inappropriately sweeping standards upon diverse tribal governments, institutions, and cultures" and imposing "an insurmountable financial burden on many tribal governments." Id. Regarding this latter statement, we see no such risk inherent in Cavanaugh's position. Precluding the use of an uncounseled tribal conviction in federal court would in no manner restrict a tribe's own use of that conviction; it would simply restrict a federal

-21-

court's ability to impose additional punishment at a later date in reliance on that earlier conviction.

In any event, the most we take from these two cases is that Supreme Court authority in this area is unclear; reasonable decision-makers may differ in their conclusions as to whether the Sixth Amendment precludes a federal court's subsequent use of convictions that are valid because and only because they arose in a court where the Sixth Amendment did not apply. Accordingly, as a matter of first impression, we hold that, in the absence of any other allegations of irregularities or claims of actual innocence surrounding the prior convictions, we cannot preclude the use of such a conviction in the absence of an actual constitutional violation.

D.     Equal Protection

Cavanaugh also presents an equal protection argument that is not fully fleshed out in his brief. He argues that, because the present issue may arise only in relation to prior offenses committed by Indians, § 117 as applied in this situation impermissibly singles out Indians because of their race and permits only Indians to be convicted of § 117 violations based upon prior, uncounseled convictions.

In United States v. Antelope, 430 U.S. 641 (1977), the Court held that federal criminal statutes did not violate the "equal protection requirements implicit in the Due Process Clause of the Fifth Amendment" because distinctions based upon tribal affiliation were not invidious race-based distinctions; they were distinctions based upon "'the quasi-sovereign status of [Indian tribes] under federal law.'" Id. at 644, 646 (quoting Fisher v. District Court, 424 U.S. 382, 390 (1976)). As noted, Cavanaugh has not fully argued this issue, and as such, he has presented no meaningful opportunity for us to address equal protection issues in this case. We note only that, when the Supreme Court issues an opinion with reasoning that appears to undercut an earlier decision, lower courts must continue to apply the earlier ruling in factual

contexts analogous to the earlier case until such time that the Supreme Court itself overturns the earlier case. See Agostini v. Felton, 521 U.S. 203, 237 (1997) ("We reaffirm that '[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.'") (quoting Rodriguez de Quijas v. Shearson/Am. Exp., Inc., 490 U.S. 477, 484 (1989)). Here the rule of Antelope appears to be directly on point, and as such it would seem that we must apply Antelope unless and until the Court decides that certain distinctions related to Indians are race-based and merit greater scrutiny.

III. Conclusion

We reverse the judgment of the district court.

BYE, Circuit Judge, dissenting.

I agree with my panel colleagues' observation as to the Supreme Court's jurisprudence failing to provide clear direction in determining whether the Sixth Amendment precludes a federal court from using an uncounseled tribal court misdemeanor conviction to prove the elements of a subsequent federal offense. The majority's opinion exhaustively covers the subject matter and aptly describes the tension in the decisions which we must consider. I can also agree the lack of clarity means reasonable decision-makers are likely to differ on the conclusions they reach with respect to allowing or prohibiting such use of an uncounseled tribal court conviction. I disagree with the conclusion reached by the majority, however, and therefore respectfully dissent.

The Sixth Amendment requires courts to furnish counsel for indigent criminal defendants whenever they face the possibility of a deprivation of liberty; the failure to provide counsel in such situations violates the Due Process Clause. See Gideon v. Wainwright, 372 U.S. 335, 339-45 (1963) (requiring counsel for indigent defendants facing felony charges); Argersinger v. Hamlin, 407 U.S. 25, 37 (1972) (extending the rule in Gideon to any criminal charge which actually leads to imprisonment for any period of time). In Burgett v. Texas, 389 U.S. 109 (1967), the Supreme Court said "[t]o permit a conviction obtained in violation of Gideon v. Wainwright to be used against a person either to support guilt or enhance punishment for another offense . . . is to erode the principle of that case." Id. at 115. After Burgett, the Supreme Court nonetheless eroded Gideon by allowing uncounseled convictions to be used to enhance a sentence in a subsequent conviction. See Nichols v. United States, 511 U.S. 738, 747 (1994) ("Reliance on such a conviction is also consistent with the traditional understanding of the sentencing process, which we have often recognized as less exacting than the process of establishing guilt.").

I do not believe, however, the Supreme Court has eroded the other half of Gideon, that is, the prohibition on using an uncounseled conviction to support guilt for another offense. In Lewis v. United States, 445 U.S. 55 (1980), the Supreme Court held such a use was permissible only because the uncounseled conviction was being used to support what the Court characterized as an "essentially civil disability," i.e., the prohibition on a felon's possession of a firearm. Id. at 67. The Court justified the use of an uncounseled conviction to impose a criminal sanction to enforce a civil disability by explaining Congress could rationally include uncounseled convicted felons "among the class of persons who should be disabled from dealing in or possessing firearms because of potential dangerousness." Id.

Section 117 of Title 18 cannot be characterized as merely imposing a civil disability on a certain class of potentially dangerous persons – the statute is clearly aimed at recidivist criminal behavior where prior offenses are necessary and integral elements of a subsequent federal offense. In such a situation, I submit, the reliability of a prior conviction matters. See United States v. Mendoza-Lopez, 481 U.S. 828, 833 (1987) (prohibiting the use of an uncounseled deportation proceeding to prove "an element of the crime" in a subsequent criminal prosecution).

There remains the problem that an uncounseled misdemeanor conviction obtained in tribal court does not directly implicate the Sixth Amendment. I nonetheless believe such a conviction should be treated as involving a constitutional violation where it is used to prove an element of an offense in a subsequent federal court proceeding where the Sixth Amendment *is* implicated. As to such a proposition, I find persuasive United States v. Ant, 882 F.2d 1389 (9th Cir. 1989), where the Ninth Circuit prohibited the use of an uncounseled tribal court guilty plea to prove the elements of a subsequent federal charge because "the tribal court guilty plea was made under circumstances which would have violated the United States Constitution were it applicable to tribal proceedings." Id. at 1390. In this case, the district court correctly observed, "[t]he issue before the Court is not to question the validity of the tribal court proceedings or question the tribal justice system, but instead to evaluate whether the convictions satisfy constitutional requirements for use in a federal prosecution in federal court." United States v. Cavanaugh, 680 F. Supp. 2d 1062, 1075 (D.N.D. 2009). I am not convinced by the majority opinion's attempts to distinguish Ant on the ground the federal prosecution for manslaughter involved therein arose out of the same alleged incident involved in tribal court. In my view, the key in both cases involves the use of the prior proceeding to prove an element of a subsequent federal offense. See Burgett, 389 U.S. at 115 (prohibiting the use of a

"conviction obtained in violation of <u>Gideon v. Wainwright</u> to be used against a person . . . to support guilt . . . for another offense").

I respectfully dissent.

_____